1
2
3
4
5                          UNITED STATES DISTRICT COURT
6              WESTERN DISTRICT OF WASHINGTON AT TACOMA
7
JAMIKA SCOTT                              | NO.  3:24-cv-5066

Plaintiff,

    v.                                   | COMPLAINT FOR DAMAGES

CITY OF TACOMA and Officers              | 42 U.S.C. § 1983 and SUPPLEMENTAL
CHRISTOPHER BAIN, CONNOR COCKLE,         | STATE CLAIMS
SHANE GENIS, DAREN HOLTER,
CHRISTOPHER MUNN, PATRICK                | DEMAND FOR JURY TRIAL
PATTERSON, BRENT ROBERTS, SCOTT
SHAFNER, JEFFREY SMITH, DOUGLAS
WALSH, and DOEs 1-3.

Defendants.

## I.      **INTRODUCTION**

Jamika Scott has long been a vital community leader, political figure, and advocate for police accountability.  Several hours after Tacoma Police ("TPD") Officer Khanh Phan ran over a pedestrian in his police cruiser, Defendants fabricated a pretext to order dispersal, then assaulted and unlawfully arrested Ms. Scott, then fabricated reports to cover it up.

There had been no crowd and no danger to police for hours.  The few who remained were watching and recording TPD investigate itself.  Defendants admit in their incident reports that they became agitated when they heard mean words being yelled by some.  Only Ms. Scott with her video device and another person with his bullhorn were arrested.  No charges were ever filed.

COMPLAINT

**THE LAW OFFICE OF BEVERLY ALLEN**
1502 S. Union Ave Ste 1, Tacoma WA 98405
Telephone: (253) 788-6376
www.TacomaLegalCoach.com

## II.     PARTIES

1.     Plaintiff Councilmember Jamika Scott is a resident of Pierce County, Washington.

2.     Defendant City of Tacoma is a municipality sued for its unconstitutional policies, customs, and practices, as well as its vicarious liability for state law claims.

3.     All TPD officers are sued in their individual capacities.

4.     Defendants Chris Bain, Connor Cockle, Shane Genis, Daren Holter, Christopher Munn, Brent Roberts, and Douglas Walsh, were at all relevant times TPD officers.

5.     Defendants Patrick Patterson, Scott Shafner, and Jeffrey Smith were at all relevant times ranking TPD officers on scene during the incidents herein described.

6.     Among Defendants DOE are other officers and supervisors who integrally participated in the unlawful activities herein alleged.

7.     Among Defendants DOE are final policymakers who promulgated and/or ratified unconstitutional policies, customs, and practices.

## II.     JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the federal claims arising under 42 U.S.C. § 1983 *et seq.*

9.     This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §§ 1367.

10.     Proper venue lies in the Western District of Washington because the events giving rise to Plaintiff's claims occurred in Tacoma, Washington. 28 U.S.C. § 1391(b)(2).

COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### III.   FACTS

*The Retaliatory Unlawful Arrest and Excessive Force:*

11.    On Saturday January 23, 2021, around 9:30 p.m., Plaintiff Jamika Scott was standing lawfully and peacefully outside police tape that had been stretched from each corner of the intersection of Pacific Avenue and 9th Street.  A small crowd of peaceful onlookers had gathered, several of whom were filming as TPD investigated itself.



12.    Around 6:30 p.m., TPD Officer Phan had driven west on 9th Avenue through a crowd of people, ramming several and completely running over the body of one man.  After a period of citizen outrage, the area had been peaceful for hours.



COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

13.     Jamika Scott had arrived specifically to engage in public oversight of the post-incident police self-investigation, and to voice her opposition to running over citizens.  Scott and her fellow observers were at all times peaceful, even observing the pandemic protocols of masking and social distancing.

14.     Although Ms. Scott needed no justification for peacefully observing and filming police conduct from outside the police line, it should be noted that the entire United States was still reeling from the many murders of unarmed black people by police.  Manuel Ellis had very recently been killed by TPD.

15.     Ms. Scott began filming outside the police tape from approximately the turn lane on Pacific Avenue, north of the police line.  Police were also excluding traffic at the intersections of Pacific and 7th to the north and 10th to the south ("traffic perimeter"), but observers, pedestrians, and restaurant patrons and employees were all present within the incoming traffic barriers while respecting the police line.

16.     Defendants gave an arbitrary dispersal order based upon a pretextual and nonexistent need to force compliance with an 'outer perimeter.'   The observers, including Ms. Scott, maintaining a healthy skepticism of TPD self-investigation, perceived a coordinated effort to avoid citizen oversight and cover up a fellow officer's violent crime.

17.     Although Ms. Scott was standing in an area clearly authorized by the police line, Defendants crossed outside the line and zeroed in on Scott.  The attackers in riot gear outnumbered the observers.  As they advanced, Ms. Scott switched her phone to live stream on Instagram.

18.     Video footage from behind the attack appears to indicate that Defendants sought to herd the observers into the small space between the deep stormwater trenches bordering Pacific and

COMPLAINT

the police tape, then uphill to where observation would be greatly diminished or impossible. An equally reasonable conclusion from the video evidence is that Defendants craved confrontation.

19.     Defendant Smith focused on Jamika Scott's cell phone, with which she continued streaming and recording, shoving her and smacking the phone from her hand. Defendants Holter, Smith, Cockle, and Genis, forced Ms. Scott up against the tall curb surrounding the deep stormwater trench.

20.     Rather than fall into the stormwater trench, Ms. Scott stumbled to the ground on Pacific at an accelerated rate due to the shoves of Smith, Holter, Cockle and Genis. Defendants kept Ms. Scott pinned face down on the concrete against the curb, one officer placing his knee in Ms. Scott's back. Ms. Scott sustained prolonged pain from the impact.

21.     The following photo shows Ms. Scott in a light-colored shirt being slammed to the ground by Defendants:



COMPLAINT

The Law Office of Beverly Allen
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

1

2

3    22.    Defendant Holter then vindictively placed handcuffs on Jamika Scott so tightly that

4  it caused her intense and lasting pain and bruising.  Despite Scott's repeated protests that she was

5  in great pain and had little to no blood circulation, Defendants Smith, Cockle and Holter refused to

6  loosen the cuffs.

7    23.    Jamika Scott, having been unlawfully arrested, was then unlawfully transported to

8  the jail by Defendant Munn.  Ms. Scott was unlawfully imprisoned for several painful hours, her

9  handcuffs loosened only one single click by jailors.  Furthermore, as part of the booking process,

10 Ms. Scott was forced strip down; made to choose between wearing jail issued underwear or none

11 at all; produce a urine sample; be fingerprinted and photographed; all while being led to believe

12 that she would likely have to spend the weekend in jail. No charges were ever filed because no

13 crime was committed by Ms. Scott.

14 ***The Coordination and Coverup:***

15   24.    The entire episode was orchestrated.  Officer Phan's carnage had fully unfolded

16 within the police line, yet several hours later the defendants would fabricate a false justification for

17 completely removing all citizen observers from all areas in which observation could occur with any

18 accuracy.

19   25.    Defendant Officer Douglas Walsh falsely claimed the "crime scene area was much

20 too small" and that a "hostile crowd" numbering "25-30 subjects" was in the area where Jamika

21 Scott was located.  There were around 13 observers standing peacefully outside the north police

22 line, and no part of Officer Phan's violent action occurred north of the tape.

23   26.    There was zero hostility except some free speech that hurt the officers' feelings (e.g.

24

25

26

COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

"there were several people using megaphones shouting disparaging comments towards us"). Defendant Sergeant Shafner complained that there were "angry people yelling at us" and was clearly offended that "[t]hey were screaming obscenities at us and taunting us while they videotaped us."

27.     Defendant Shafner's retaliatory animus bleeds through his report.  For instance, his pugilistic demeanor caused him to note that the small group of observers "were clearly ready to fight…and they were trying to goad us into it."  See photo in Paragraph 11, *supra*, for reference.

28.     Defendant Patrick Patterson also attempted to countenance the unconstitutional behavior.  Patterson condensed the timeframe of several hours into his incident report, making it seem as if the "tense situation" aftermath of Officer Phan's carnage continued from Patterson's 6:28 arrival until the unlawful arrest and assault of Ms. Scott around 9:40.

29.     Shafner used a similar time-condensing tactic.  Smith also obfuscated the passage of several hours and dispersal of the crowd: "After some time…a crowd began to form…very angry and yelling."  In reality, there was no urgency or danger due to the small number of the crowd that had formed over several hours to observe TPD investigate itself.

30.     Like his coconspirators, Smith attempted to justify the arbitrary attack as a necessary expansion of the perimeter, justified by a nonexistent "crowd."  Smith admitted that protestors got under his skin ("attempted to agitate officers") and tellingly impugned them for their lawful conduct ("remained right at the crime-scene-tape-line").

31.     Smith lied in his report, depicting a negotiation with Ms. Scott where video shows Smith shoving her.  Smith further fabricated that Ms. Scott "began moving into our police line."  The video shows Smith, Patterson, Holter, Walsh, Shafner, Cockle, and several others had

COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

completely surrounded Ms. Scott like a gang and shoved her against the deep stormwater trench.

32.    Defendant Genis admitted that he had pushed Ms. Scott "back towards the line and she fell to the ground."   Smith's obfuscation tactic is familiar to students of police misconduct, similar to when police allege Assault 3 on the basis that an arrestee has used his face to hurt the officer's fist.

33.    Smith also hid his coordination with coconspirators by muting "the audio [of his BWC][1] at multiple times during the incident for [Law Enforcement] sensitive conversations" and shutting off the whole BWC system after the assault.  Neither a detective nor an investigator, Smith had no lawful basis to hide what was being said about the impending unconstitutional attack.

34.    In retaliation for "anti-Police phrases," Patterson and Shafner assembled the team of 15 officers who would arbitrarily expand the police cordon beyond any reasonable or necessary range under the pretext of danger and urgency.  Patterson gave the attack order and justified it in a *second* incident report, written 26 days after the event.

35.    Against the backdrop of Defendant Patterson's fabricated urgency and danger, he painted an image of an "inner perimeter" that was demarcated by the police tape Ms. Scott was respecting and a fantasy "outer perimeter" ranging "between 7th and 11th to ensure the safety of the investigation team."  In several videos, a Defendant's (likely Smith) unelevated speaking voice can also be heard from the observers' side of the police tape saying, "We need all of Pacific.  Go up to Commerce."

36.    Police had long been at the traffic perimeter, logically keeping incoming vehicles from dead-ending into the block, but there was no lawful reason for observers on foot to be expelled

---

[1] Body-Worn Camera

COMPLAINT

from the police line as to an "outer perimeter." The absurdity of it all could only be blunted by fiction.

37.     Defendant Shafner crafted a passively voiced artifact to justify the imaginary outer perimeter: "We were told Officer Phan's car was on Pacific just north of us and we had to protect that as well." Patterson included this in his second report as well. Defendant Bain is sued for waiting a few days then crafting his report to fit the 'outer perimeter' narrative, falsely claiming to have watched as Phan's vehicle "turned right and escaped northbound on Pacific Ave."

38.     All Defendants had the same view shown in the photos *supra*. All ranking officers had seen the copious video and heard radio reports that Phan had fled up 9th and then "staged" at Commerce and 7th Streets. Many videos show Phan's SUV bump twice over his victim's body then accelerate quickly up the 9th Street hill toward Commerce. Phan never turned north down Pacific and there was no basis for Defendants to pretend the crime scene extended to an 'outer perimeter.'

39.     To indulge this absurd 'concentric perimeters' fantasy for a moment, a citizen in Ms. Scott's shoes would need to perceive the fake "outer perimeter," spanning .27 miles along Pacific Avenue (or "all of Pacific," according to Smith) and then relocate to a position outside this fake perimeter from which visual observation would have been physically impossible. For those in Ms. Scott's position, that would mean moving 700 feet north along Pacific to a point from which no observation could be made.

40.     This fake outer perimeter is also belied by the fact that no bar or restaurant on Pacific Avenue was forced to close during the relevant timeframe, nor were cars prevented from using the angled parking spaces in front of the businesses (see photos, *supra*). Finally, according to PCFIT and the Prosecutor's Office, "the intersection crime scene was cordoned off only in the immediate

COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

area of South 9th St. and Pacific Ave."

41.     The difference between those permitted to stay and those forced to leave "all of Pacific," is that the former were pedestrians and customers, and the latter were filming and speaking words that Defendants did not like.

42.     The videos clearly show the precise moment when Defendants Smith and Patterson have been so angered by free speech (e.g. "where's Forensics at? … You gonna arrest me for speech? … We're here to observe! … We're outside the line!") that they have decided to unleash violence.  No charges were ever filed.



*Discovery of Defamatory Publications:*

43.     Undersigned counsel consulted another local attorney, Jackson Millikan, while drafting this Complaint.  On December 26, 2023, Millikan advised undersigned counsel and Ms.

COMPLAINT

The Law Office of Beverly Allen
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

Page **10** of 21

Scott that he had discovered a 259-page compilation of TPD incident reports online.

44.    These reports were published by TPD.  Although there are many redactions, TPD did not redact Jamika Scott's name.  The reports contain false and defamatory statements portraying Ms. Scott as a violator of laws, member of an angry mob, aggressor, and more.  Ms. Scott may seek declaratory and/or injunctive relief concerning their continued publication.

## II.    FEDERAL CAUSES OF ACTION

### COUNT I

**RETALIATION for Free Expression, Free Association, and Petition for Redress, in violation of the 1st Amendment (against Defendants Cockle, Holter, Patterson, Shafner, Smith, Walsh, and Tacoma)**

45.    The individual defendants acted under color of state law as Tacoma Police Officers, pursuant to the customary practices and/or policies of Defendant City of Tacoma.  Defendants acted in concert and agreement with several others as is detailed in Count IV.

46.    Jamika Scott was engaged in the protected activities of observing and videorecording law enforcement from a safe distance, outside clearly demarcated boundaries, hours after any danger to officers had dissipated.

47.    Ms. Scott was engaged in free association, in attendance with, and as a member of, a community dedicated to police accountability and transparency.  A fundamental purpose of community oversight is to observe police actions.

48.    Ms. Scott was engaged in protected speech, including respectfully notifying Defendants that their unreasonable demands would negate her and her associates' ability to observe the investigation.

49.    Defendant Cockle acted in retaliation for, in his own words, a "crowd yelling

COMPLAINT

obscenities at every officer," when he joined the attack team and participated in dispersing the observers.

50.     Defendant Holter, in retaliation for the protected conduct joined the attack team and participated in dispersing the observers, as well as assaulting Ms. Scott and purposely overtightening her handcuffs.

51.     Defendant Roberts acted in retaliation for, in his own words, "yelling anti police profanity…calling us murderers, faggots, pigs and many other names; telling us to quit our jobs and kill ourselves," when he joined the attack team and participated in dispersing the observers.

52.     Defendant Shafner acted in retaliation for, in his own words, "angry people yelling at us…screaming obscenities…and taunting us while they video taped us…angry people clearly ready to fight…trying to goad us into it[, who]…videotaped me and ignored my words…[and] used vulgar language [and were] gesticulating like they wanted us to fight," when he organized, pre-planned, and joined the attack team and participated in dispersing the observers.

53.     Defendant Smith acted in retaliation for, in his own words, "[being] angry and yelling at all the officers on scene…lined up directly at the crime-scene tape…attempted to agitate officers…continued to yell and scream at us…[,]" and Ms. Scott saying "[w]e have a right to be here," when he joined the attack team and participated in dispersing the observers, as well as assaulting and unlawfully arresting Ms. Scott.

54.     Defendant Walsh acted in retaliation for, in his own words, "disparaging comments," when he joined the attack team and participated in dispersing the observers, as well as assaulting and unlawfully arresting Ms. Scott.

55.     Defendant Patterson was the supervisor on scene, gave the dispersal order, and

COMPLAINT

integrally participated in the violence.  Patterson acted in retaliation for, in his own words, "anti-Police phrases, calling Officers 'murderers,' calling for an independent investigation," when he joined the attack team and participated in dispersing the observers.

56.     The dispersal order was itself a violation of the First Amendment, designed only to chasten or punish observers and critics, and obfuscate a horrific vehicular assault by police.

57.     Defendant Smith's fixation on Jamika Scott's recording device made it clear that his primary motivation was to prevent further recording.  In the Ninth Circuit, recording of law enforcement activities in the exercise of their official duties in public spaces is a clearly established right.

58.     Even the Supreme Court has acknowledged that the First Amendment protects the gathering of news.  Tacoma Police running over Tacoma Citizens, and the aftermath thereof, was undeniably news.

59.     The retaliatory arrest would chill a person of ordinary firmness.  Indeed, Jamika Scott, a person of extraordinary fortitude, experienced a period of chilled expression.

60.     Jamika Scott's speech and video recording were the motivating factors in Defendants' decision to unlawfully seize her phone, cause her unlawful arrest, and place unreasonably tight handcuffs on her wrists.

61.     The same is true for Scott's mere presence as a well-known police oversight leader, her expression of frustration with rampant police misconduct, her association with the community engaged in police oversight, and her attempt to gather news as evidence upon which to petition for the redress of social justice grievances.

62.     At no time did officers have probable cause to believe a crime was committed.

COMPLAINT

63.     The unconstitutional acts of all defendants were a result of the City's widespread customary practices and policies, including but not limited to failure to train officers about constitutionally protected activity.  The TPD further has a policy, custom, or widespread practice of falsifying incident reports to cover up violations of constitutional rights.

## COUNT II

**UNLAWFUL ARREST in violation of the 4th Amendment (against Defendants Cockle, Genis, Holter, Munn, Patterson, Shafner, Smith, and Tacoma)**

64.     Defendants Cockle, Genis, Holter, and Smith physically seized and arrested Jamika Scott with neither probable cause nor any exception to the warrant requirement.   Ms. Scott did not consent to her seizure or arrest.

65.     Defendant Munn unlawfully seized Ms. Scott in his car that was "staged" by Defendant Shafner for that purpose.

66.     Defendant Shafner "pre-planned" the arrest and organized the attack team.

67.     Defendant Patterson ordered the attack team to move in.

68.     Jamika Scott was an unarmed, unthreatening, physically diminutive, member of the public, engaging in free expression, association, and video recording in public.

69.     Police vastly outnumbered observers.

70.     The unlawful arrest was made pursuant to the City's policies, practices, and customs, including but not limited to the failure to train officers about constitutionally protected activity and the failure to train officers about proper use of BWCs in order to safeguard constitutional rights. The officers' failure to properly use their BWCs facilitated their deprivation of Jamika Scott's

COMPLAINT

constitutional rights.   The TPD further has a policy, custom, or widespread practice of falsifying incident reports to cover up violations of constitutional rights.

### COUNT III

**EXCESSIVE FORCE in violation of the 4th Amendment (against Defendants Cockle, Genis, Holter, Smith, and Tacoma)**

71.     Jamika Scott had committed no crime and Defendants had neither reasonable suspicion nor probable cause that she had or would.

72.     Ms. Scott posed zero threat to Defendants or others.

73.     Ms. Scott's resistance was justified and calculated to preserver her bodily integrity from the assaultive behavior of Defendants.

74.     Defendants had been on scene for hours with not a single physical altercation since their own fellow officer had caused a small riot by running over several pedestrians.

75.     Defendants needed to use precisely zero force because they had no legal justification to disperse the observers or arrest Ms. Scott.

76.     Defendants nonetheless caused Ms. Scott to fall hard onto the concrete and suffer bruising and pain for weeks to come.

77.     As is clear from many video recordings, there had been zero security threat for hours.

78.     No reasonable police officer would perceive an "angry mob" or any threat whatsoever, nor would any such officer believe that all of Pacific Avenue was part of the crime scene.

79.     Defendant Cockle nonetheless participated by jamming Ms. Scott's left arm behind her back, pressing down on her back with his knee.

80.     Defendant Genis nonetheless participated by shoving Ms. Scott into the gang of

COMPLAINT

**The Law Office of Beverly Allen**
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

other violent defendants.

81.     Defendant Holter nonetheless slammed Ms. Scott to the ground and applied overly tight handcuffs.

82.     Defendant Smith nonetheless shoved Ms. Scott, grabbed her phone, then joined Holter in slamming her to the ground.

83.     The excessive force was pursuant to policies and practices of Tacoma under which police escalate situations to create discord and rationalize using force, including excessive force.

**COUNT IV**

**42 USC § 1983 CONSPIRACY to violate the 1st and 4th Amendments (against Defendants Bain, Cockle, Genis, Holter, Munn, Patterson, Roberts, Shafner, Smith, and Walsh)**

84.     Defendants all agreed expressly and tacitly to deprive Ms. Scott of her constitutional rights under the First and Fourth Amendments as pleaded *supra* and fully incorporated herein.

85.     Defendants all agreed and participated despite the clear and present lack of danger, urgency, or investigative purpose underlying their attack on the observers and Ms. Scott.  Defendant Bain agreed to and participated in the coverup.

86.     The agreement, before and after the attack, included fabricating a false justification for removing all observers from the police line on Pacific Avenue north of 9th Street.

87.     This pretext was effectuated by (i) describing a fantasy outer crime scene perimeter that either extended to "all of Pacific" or for .76 miles between 7th and 11th Streets, (ii) falsely depicting the area north of the police line as part of the crime scene, (iii) and falsely claiming there was danger posed by a nonexistent angry mob.

88.     Having agreed to deprive Ms. Scott of her rights, Defendants (except Bain) then deprived her of said rights by assaulting and falsely arresting her in retaliation for her protected

COMPLAINT

activity.

89.    Before the attack, Defendants except for Bain agreed to, in Shafner's words, a "pre-planned" attack on the observers and Ms. Scott.  Defendants assembled and perpetrated the attack as described *supra* in violation of Scott's constitutional rights.

90.    After the attack, several defendants agreed to and did falsify incident reports to cover up the violations of the whole group.  Beyond what is described *supra* about the tactics used in these reports, what follows is a sample of specific statements currently known to Ms. Scott through publicly available records:

91.    Defendant Bain delayed his report for three days, then lied about seeing Phan's SUV after hitting the pedestrians, as it "turned right and escaped northbound on Pacific Ave."  This never happened.  The purpose was to further the conspiracy by providing a faux investigative and evidential basis for extending the crime scene up Pacific, thereby retroactively justifying the attack.

92.    Defendant Cockle falsely claimed "[t]he crowd had block[ed] north and south lanes of Pacific Ave on the north side of the intersection with S 9th St."  In fact, it was the police who blocked the intersection with yellow tape and the observers respected it.  The purpose of the lie was to further the conspiracy by retroactively providing a faux law enforcement and security basis for attacking the observers.

93.    Defendant Patterson wrote two incident reports.  The first set up the myth of inner and outer perimeters of a massive crime scene, but only generally described Phan's SUV as "located at 7th and Pacific…."  After 26 more days had passed, and all the other incident reports had been filed, Patterson wrote his second report which began with the same two paragraphs as his first.

94.    However, Patterson's second report was careful to elaborate that "Phan had

The Law Office of Beverly Allen
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
Ph: 253-778-6376

relocated to S 7th and Pacific Ave to hide from the hostile crowd (who were upset with him)." Omitted from both reports was the fact that Phan did not flee down Pacific, but later drove to the angled parking above Pacific on 7th Street.    Patterson's lies and omissions were purposed to further the conspiracy by placing Phan's SUV on Pacific north of the observers and Ms. Scott, thereby retroactively justifying the attack as an expansion of the crime scene up Pacific.

95.     Defendant Roberts claimed that the attackers needed "the whole 700 to 900 block of Pacific Ave, thus requiring us to expand our area of control in order to preserve scene security…as well as evidence preservation."  He further claimed that the attack was carried out "in order to preserve the integrity of the scene…."  Roberts' lies and omissions were purposed to further the conspiracy by justifying the attack.

96.     Defendant Shafner approved several reports containing falsehoods and material omissions.  Shafner also falsely reported that Ms. Scott and the observers were an "angry mob" and that they were proposing to fight the police.

97.     Shafner falsely claimed that he and his coconspirators "were told that Officer Phan's car was on Pacific," when he could see all the way down Pacific and knew from videos, radio transmissions, and his fellow officers, that Phan had departed up 9th Street.   The purpose was to further the conspiracy by providing a faux investigative and evidential basis for extending the crime scene up Pacific, thereby retroactively justifying the attack.

### III.    STATE CAUSES OF ACTION

### COUNT V

**NEGLIGENCE for breaching the *Beltran-Serrano* standard of care (against Defendants Cockle, Genis, Holter, Munn, Patterson, Shafner, Smith, and Tacoma)**

98.     Defendants owed Ms. Scott a duty of reasonable care to refrain from causing

COMPLAINT

foreseeable harm.

99.     Defendants breached the duty by ignoring Ms. Scott's peacefulness, her compliance with the police line, her criminal innocence, and her exercise of rights conferred by the state and federal constitutions.

100.     Defendants breached the duty by silencing, attacking, shoving, slamming, handcuffing, kneeling on, and imprisoning, Ms. Scott without any legal justification.

101.     Defendants mishandled the situation at best, and intentionally breached their duties at worst.  Defendants caused Ms. Scott great physical pain, emotional and mental anguish, and reputational harm.

102.     Tacoma is vicariously liable for the negligence of the individuals.

## COUNT VI

### DEFAMATION (against Defendants Holter, Roberts, Smith, and Tacoma)

103.     Defendants wrote false statements of fact in their reports concerning Ms. Scott, without privilege and without regard to the truth or falsity of their statements.  The statements caused reputational and emotional harm to Ms. Scott.

104.     Defendant Holter falsely wrote, "I witness [Jamika Scott]…attempt to flee northbound on Pacific Ave from S 9th St."  This statement is belied by clear video and accounts of other officers and observers, which reveal Ms. Scott was assaulted and shoved northbound along the deep stormwater trench as she fell to the pavement.

105.     This lie falsely impugns Ms. Scott as a criminal who would "flee" rather than the upstanding citizen and community leader she is.

106.     Defendant Roberts falsely wrote that Ms. Scott "pushed past [Smith] and

COMPLAINT

aggressively attempted to move towards officers' backs…." This statement is belied by clear video and accounts of other officers and observers, which reveal Ms. Scott was assaulted and shoved northbound along the deep stormwater trench as she fell to the pavement.

107.    This lie falsely impugns Ms. Scott as a criminal who would act in a violent manner toward police officers, when she was in fact a victim of their assaults.

108.    Defendant Shafner falsely wrote that Ms. Scott was participating in an "angry mob [that] was standing in a part of the crime scene that had yet to be protected from damage and tampering." As copious videos and official records clearly demonstrate, the small group of observers was not an angry mob and were not standing in a crime scene, but rather outside an area designated by the yellow police line.

109.    These lies falsely impugn Ms. Scott as an angry criminal tampering with or destroying evidence of the very crime she sought to have properly investigated.

110.    Defendant Smith falsely wrote that Ms. Scott "moved east, into my line of officers" despite Defendant Genis having propelled her there with a shove. Defendant Smith falsely wrote, "she tried to run from the line of officers, westbound." This statement is belied by clear video and accounts of other officers and observers, which reveal Ms. Scott was assaulted and shoved northbound along the deep stormwater trench as she fell to the pavement.

111.    These lies falsely impugn Ms. Scott as a criminal who would attempt to infiltrate a line of police officers but, at the same time, try to run away as though she had done something wrong, when in fact Ms. Scott is and was an upstanding member of the community acting within her constitutional rights.

112.    Defendant Tacoma is vicariously liable for the foregoing defamatory statements and

COMPLAINT

directly liable for publishing the unredacted police reports online.

## IV.   RELIEF SOUGHT

113.    Ms. Scott hereby demands a trial by jury.

114.    Ms. Scott will seek all available compensatory and punitive damages for past, present and future pain and suffering, physical, mental, emotional, and economic expenditure, injury and deprivation, as well as pre- and post-judgment interest.   Alternatively, presumed damages should be awarded.

115.    Ms. Scott will seek the foregoing compensatory and punitive damages in an amount ascertained according to proof, the value of his damages to be determined by a jury of her peers.

116.    By specifying one form of damages, Ms. Scott does not foreclose or waive any other applicable form of damages as to any claim.

117.    Ms. Scott reserves the right to move for injunctive or declaratory relief.

118.    Ms. Scott requests an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988, or any other suitable basis, and for such other relief to which he may be justly entitled in the wisdom of the Court.

Respectfully Submitted,

JAMIKA SCOTT

By_____
Beverly Allen, WSBA 42889
The Law Office of Beverly Allen
1502 S. Union Ave, Ste 1
Tacoma, WA 98405
beverly@tacomalegalcoach.com
Ph: 253-778-6376

COMPLAINT