1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMIKA SCOTT, | Case No. 3:24-cv-05066-TMC |
| Plaintiff, | |
| | ORDER GRANTING DEFENDANTS' |
| v. | SUMMARY JUDGMENT MOTION |
| CITY OF TACOMA and Officers | |
| CHRISTOPHER BAIN, CONNOR | |
| COCKLE, SHANE GENIS, DAREN | |
| HOLTER, CHRISTOPHER MUNN, | |
| PATRICK PATTERSON, BRENT | |
| ROBERTS, SCOTT SHAFNER, JEFFREY | |
| SMITH, DOUGLAS WALSH, and DOEs 1- | |
| 3, | |
| Defendants. | |

## I.    INTRODUCTION

On January 23, 2021, a Tacoma police officer responding to an illegal street racing event allegedly drove through a crowd of people, injuring bystanders and sparking anger. Hours later, a group of citizens gathered on the corner of South 9th Street and Pacific Avenue near the incident

to observe the police response. Officers in charge of securing the scene determined that investigators needed Pacific Avenue cleared between South 7th Street and South 11th Street. As depicted in body-camera footage, after issuing a series of verbal warnings ordering the observers to move one block up the hill—directives which went unheeded—officers approached the group on foot to move them out of the street.

Plaintiff Jamika Scott, one of the observers filming the officers, refused to move. Defendant Officer Jeffrey Smith warned that anyone who did not leave the street would be arrested. Scott briefly began retreating to where other observers stood near the curb on Pacific Avenue, but seconds later, she moved back into the street towards the line of officers attempting to clear the area. Smith warned Scott again that she would be arrested and attempted to grab her by the wrist, but she pulled away. Smith stated that Scott was under arrest and attempted to grab Scott again, but she turned away from him, towards the curb on Pacific Avenue where Smith pulled her to the ground. Scott resisted being handcuffed while on the ground, but Smith and Defendant Officer Daren Holter restrained her, handcuffed her, and brought her to her feet. Scott was on the ground for less than a minute. Officers arrested Scott for obstruction and transported her to the Pierce County jail, along with one other citizen observer who had refused to move out of Pacific Avenue. Scott was released after several hours and no charges were filed. She did not seek medical attention.

Scott sued Smith, Holter, and other named officers ("Individual Defendants"), as well as the City of Tacoma. Dkt. 1. She brings federal constitutional claims of retaliation for speech, unlawful arrest, excessive force, and conspiracy. *Id.* ¶¶ 8, 45–97. Scott also alleges state law violations of negligence and defamation. *Id.* ¶¶ 98–112. On June 26, 2025, Defendants moved for summary judgment on both Scott's federal and state claims. Dkt. 24. Having heard argument and reviewed the parties' briefing and the relevant record, the Court finds that Scott has failed to

raise a question of material fact on any of her claims. Accordingly, the Court GRANTS the motion. All of Scott's claims are DISMISSED WITH PREJUDICE.

## II.    BACKGROUND

### A.    The Court's role on summary judgment

To begin, the Court notes that Scott has cited barely any evidence in support of her arguments, and the Court declines to search the record or piece a case together on her behalf where she has not done so. It is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if it elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (citation omitted). In fact, the Court *cannot* do so: under the "principle of party presentation," courts must presume that "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 376–77 (2020) (citation modified).

Scott's briefing is largely devoid of citations to the record. *See generally* Dkt. 31. In the few instances Plaintiff supports her assertions, she cites only generally to entire deposition transcripts. *See id.* at 2–3. This violates the Court's local rules. *See id.* at 2–3; LCR 10(e)(6) ("[T]he parties shall, insofar as possible, cite the page and line of any part of the transcript or record to which their pleadings, motions or other filings refer."). And in the one instance Plaintiff cites the page and lines of a deposition transcript, the citation is incorrect. *See* Dkt. 31 at 3 (stating that Smith "conceded in his deposition that [ ] Scott was 'barely' compliant" and citing to 85:2–4 of transcript); Dkt. 32 at 109 (showing Scott's comment that Smith was "barely" compliant at 120:6–9).

Accordingly, the facts recounted in this Order are drawn from the cited evidence produced by Defendants, including the body-worn video footage from Officer Smith, and Plaintiff's limited evidence cited in her brief. *See* Rule 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

The parties agree, however, that the primary piece of evidence in this case is the body-worn video footage. *See* Dkt. 35 at 3 ("[T]he court has the benefit of a video showing objectively what happened[.]"); Dkt. 31 at 6 ("[T]he video footage in this case . . . raises further questions about what officers said and did before, during, and after the arrest.").

**B.      The events of January 23, 2021**

On January 23, 2021, between 5:30 and 6:30pm, Tacoma Police Department ("TPD") officers responded to reports of illegal street racing downtown. Dkt. 1 ¶ 12; Dkt. 25 at 12. During TPD's response, one officer allegedly drove "through a crowd of people on 9th Street," injuring bystanders. Dkt. 1 ¶ 12; Dkt. 25 at 12. Following the incident, TPD set up an initial police perimeter "to protect the scene and to establish a perimeter so that the collision investigation could be conducted and completed by an outside agency, the Pierce County Force Investigation Team (PCFIT)." Dkt. 26 ¶ 2. That perimeter included police tape on the south and north sides of the intersection of Pacific Avenue and South 9th Street. *See* Dkt. 1 ¶ 11. "A small crowd of peaceful onlookers had gathered" behind the police tape on the northside of the intersection, "several of whom were filming[.]" *Id.* Scott was among this group "observing and filming police conduct" shortly before 9:30pm. *Id.* ¶¶ 11, 14. She alleges that "[a]fter a period of citizen outrage, the area had been peaceful for hours." *Id.* ¶ 12.

Defendant Lieutenant Patrick Patterson "and other scene commanders made a decision to expand the area to be cordoned off for the PCFIT investigation" to include "not only the

potential scene containing physical evidence, but also an area to allow the scene investigators to move and work the scene without potential interference." Dkt. 26 ¶ 4; *see also* Dkt. 25 at 12 (TPD Supplemental Report explaining that "[d]ue to the number of responding patrol vehicles parked along Pacific Ave and expanded scene between 7th and 11th and Pacific Ave, [Patterson] determined it was necessary to continue sealing off all vehicle and pedestrian traffic along Pacific Ave between 7th and 11th to ensure the safety of the investigation team and integrity of the investigation.").

Patterson and Smith approached the group of observers to explain that the expanded perimeter on Pacific Avenue required them to move one block west up the hill to Commerce Street. Dkt. 25 at 23–24; Dkt. 26 at 27:08–28:02. Video footage from Smith's body-worn camera captures most of the interactions between officers and the group of observers, including Scott:

> Patterson: We need to do an investigation, an independent investigation.
>
> Man in orange shirt: Fuck [Mayor] Woodards, she always says that. What about those Black men that got killed. Oh, independent, my ass!
>
> Patterson: However, however, we need all of Pacific. We're going to ask that all of you go up to Commerce.
>
> Scott: If you want an independent investigation, you're going to let the people watch . . . y'all covered up the murder of Manuel Ellis and we are not leaving because you are covering up shit . . . . Absolutely not, we're not going anywhere.
>
> Smith: You must disperse.
>
> Patterson: We're asking you to move one block.
>
> Scott:  We are a community oversight committee and . . . [inaudible].
>
> Smith: We're not saying you have to leave. We're asking you to move one block that way. You will still be able to see.

Dkt. 26 at 27:08–28:02.

After the initial request, Patterson and Smith walked back to the south side of the intersection where other officers were stationed and requested someone make a second announcement over the loudspeaker to clear Pacific Avenue. *Id.* 28:42–29:14.

> Officer (over loudspeaker): Alright folks, listen up, final warning to disperse. Leave the area, westbound on 9th.
>
> Observers (chanting): We're not moving! We're not moving!
>
> Officer (over loudspeaker): Folks, listen up, this is your final warning: you can stay on Commerce Street or Court A . . . . You have the decision, Commerce Street or Court A. Your choice. This now a crime scene on Pacific Avenue. Please vacate.

*Id.* at 29:23–30:04.

The video shows observers not moving from their positions on Pacific Avenue behind the police tape. *Id.* at 30:10–30:16. Smith then informed the other officers that "we're going to swoop that way," pointing to the east side of Pacific Ave towards Court A, "and push them that way," pointing to the west side of Pacific Avenue up the hill towards Commerce Street. *Id.* at 30:17–30:22. Another officer repeats the directive over the walkie-talkie. *Id.* at 30:50 ("All units, we're going to start moving the folks up the hill right now[.]"). As the officers crossed the intersection and walked to the east side of Pacific Avenue, one officer told an observer filming with a flash that he can "move up this way," pointing up the hill to Commerce Street "or this way," pointing to Court A. *Id.* at 31:25.

As Smith approached the group of observers on the west side of Pacific Avenue, Scott stood farthest into the street, filming in the officers' direction. *Id.* at 31:38; *see* Dkt. 1 ¶ 17. Facing Scott, Smith instructed her to move, raising both of his arms in the direction of Commerce Street. Dkt. 26 at 31:40–44. Scott did not move. *Id.* at 31:41–43. Smith touched Scott's arm to physically guide her in the direction of Commerce Street, which Scott resisted:

> Scott: Don't touch me, do not touch me. Do not touch me. Do not . . . get your hands off me! Get off of me!

Smith: Let's go, move back.

Other officer: You need to disperse.

Scott: No, we have a right to be here.

Smith: Move back, move back.

Scott: Get off of me . . . get your fucking hand off of me.

Smith (in the direction of Scott and the observers standing behind her): You will be arrested if you do not disperse.

*Id.* at 31:44–31:55.

Smith's body-worn camera video shows Scott, still filming, but taking steps backwards towards the curb where the other observers were standing. *Id.* 31:59–32:06; *see also* Dkt. 31 at 109 ("Q . . . Would you say that moving back in this frame – we're at 21:31:59 -- is Ms. Scott being physically compliant? [Smith] . . . Barely."). But within ten seconds, Scott stepped back into Pacific Avenue towards the line of officers attempting to clear the street. *See* Dkt. 26 at 32:09. Scott walked behind and to the right of Smith. *Id.* 32:09–10. When Smith turned to see Scott on his right, he moved his arm towards her, which Scott brushed off. *Id.* 32:10–11. Smith gave a second arrest warning: "Ma'am you will be placed under arrest if you do not disperse." *Id.* at 32:12.

Scott kept walking into Pacific Avenue in the direction of officers arresting another observer, Daniel Russell. *Id.* at 32:12–15; *see also* Dkt. 25 at 10 (Defendant Officer Douglas Walsh's Supplemental Report stating that Russell "immediately sat down and refused to move thereby passively resisting a lawful order to disperse an active crime scene"). Scott appeared to be filming Russell's arrest. Dkt. 26 at 32:13; *see also* Dkt. 25 at 10 ("I then observed [Scott] standing to the left of [Russell] videotaping [ ] Smith and me."). Smith reached for Scott again, this time grabbing her by the wrist. Dkt. 26 at 32:14. Scott again pulled away, shouting "Stop, get off of me," as she turned her body away from Smith and back in the direction of the curb. *Id.*

at 32:14–15. At that point, Smith can be heard on the video saying, "She's under arrest." *Id.* at 32:15; *see* Dkt. 25 at 22 (Smith's Supplemental Report stating that "[g]iven her obvious active resistance, I said, 'She's under arrest.'"). Scott continued to move towards the curb, shouting "Get the fuck off of me." Dkt. 26 at 32:16. Smith can be seen grabbing Scott from behind as her feet reach the curb. *Id.* at 32:17. A second later, Scott is on the ground, her head by the curb. *Id.* at 32:18.

The parties dispute how Scott ended up on the ground and the video does not clearly show what happened. *See* Dkt. 1 ¶ 20 ("Ms. Scott stumbled to the ground on Pacific at an accelerated rate due to the shoves of Smith, Holter, Cockle and Genis."); Dkt. 35 at 9 ("[H]er actions of moving away from officers caused her fall to the ground.") In his Supplemental Report, Smith states that he "was able to grab her right arm and pull her down to the ground." Dkt. 25 at 22. Viewing the evidence in the light most favorable to Scott for the purpose of summary judgment, the Court assumes that Smith pulled Scott to the ground intentionally.

Several officers formed a line in front of Smith and Scott, shouting at the remaining observers to move back. Dkt. 26 at 32:20–25. While still on the ground, but not visible to Smith's body-worn camera, Scott is heard saying, "My name is Jamika Scott. There's a police officer on my back. On my knee. On my neck." *Id.* at 32:25–30. The video shows officers attempting to pull Scott's left arm behind her back at the same time Smith reaches for Scott's right arm. *Id.* at 32:31. In the same frame, Smith's left arm is holding a baton pressed against Scott's back. *Id.* Another officer is overheard on the video saying, "Get your hands behind your back." *Id.* at 32:32. As officers attempted to restrain Scott, she began yelling, "Get the fuck off of me! Get the fuck off of me! Get the fuck off of me!" *Id.* at 32:32–36. Officer Holter brought Scott's left arm behind her back first. *Id.* at 32:36. Two officers then grabbed Scott's right arm while she was still on the ground, bringing it behind her back. *Id.* at 32:37–40. As Holter started

handcuffing Scott, she can be overheard yelling, "Get off my fucking back!" *Id.* at 32:40–50. The video shows Holter sitting on Scott's lower body while he handcuffs her. *See id.* At no point does the video show any officers sitting or placing their body weight on Scott's back or neck. Once Scott was handcuffed, Smith told the other officers, "Get her up, get her up." *Id.* at 33:00–04. Officers then lifted Scott to her feet. *Id.* at 33:09.

Scott described various sources of pain from the encounter. *See* Dkt. 25 at 32 ("I was feeling a bit of pressure on my back as well . . . [a]nd then my arm was hurting and, like, my shoulder on my right side, and the cuffs were really, really tight."). As she was transported to the Pierce County Jail, she asked for the cuffs to be loosened "and one of the officers just loosened one of the cuffs, like, one click." *Id.* at 35. Most of the pain subsided within a day or a week, although she mentions that her shoulder pain "lasted kind of off and on maybe for . . . about three, four months" before going away. *Id.* at 36–37. Scott did not seek medical treatment for any of the physical pain she described, as she felt "a hurt shoulder didn't feel like a reason to potentially catch COVID." *Id.* at 36.

Scott was booked into the Pierce County Jail on a charge of obstructing a law enforcement officer. Dkt. 25 at 20. She was released after several hours and no charges were filed. *See* Dkt. 25 at 36; Dkt. 1 ¶ 23.

## C.    Procedural history

On January 22, 2024, Scott filed her complaint against Defendants, asserting both federal and state claims. Dkt. 1. Scott brings federal constitutional claims under 42 U.S.C. § 1983, asserting violations of her First Amendment protection against retaliation for speech, Fourth Amendment protections against unlawful arrest and excessive force, and conspiracy to violate the First and Fourth Amendments. *Id.* ¶¶ 8, 45–97. The Complaint also alleges state-law violations of negligence and defamation. *Id.* ¶¶ 98–112.

On June 26, 2025, Defendants moved for summary judgment on all claims. Dkt. 24. The next day, Defendants moved to exclude Plaintiff's expert Catey Avaava. Dkt. 28. In Scott's response to Defendants' Motion for Summary Judgment she asserts claims for the first time of false arrest and false imprisonment, intentional infliction of emotional distress, assault, and battery.[1] Dkt. 31 at 27. Oral argument was held on August 25, 2025. Dkt. 39. At the hearing, the Court issued an oral ruling granting Defendants' Motion to Exclude Plaintiff's expert Catey Avaava because her testimony was not relevant to Scott's claims. *See* Dkt. 39. The Motion for Summary Judgment is fully briefed and ripe for review.

## III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an

---

[1] The Court declines to consider these untimely claims because a plaintiff "may not raise allegations for the first time during summary judgment proceedings." *Russell v. Pac. Motor Trucking Co.*, 672 F. App'x. 629, 631 (9th Cir. 2016) (citing *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)).

essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). But "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

When the evidence includes video footage, such as the body-worn camera footage in this case, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in the non-movant's favor. *See Scott* v. *Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't.*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). But if a party's asserted facts are obviously contradicted by the video, the Court must consider the facts as depicted by the video. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## IV.     DISCUSSION

**A.     The Court dismisses all claims against Individual Defendants Cockle, Walsh, Bain, Genis, Munn, and Roberts.**

At the outset, Defendants assert in their briefing and at oral argument that Scott failed to identify the actions of most Individual Defendants named in the Complaint that would give rise to the alleged constitutional deprivations in this case. *See* Dkt. 35 at 5; Dkt. 39. The Court agrees.

To support a claim for relief under Section 1983, as Scott does here, a plaintiff must show: (1) that she suffered a violation of rights protected by the Constitution or created by federal statute, and (2) that the violation was proximately caused by a person acting under color of state law. *See, e.g.*, *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the causation requirement, a plaintiff must show that a defendant caused the alleged deprivation by doing an affirmative act, participating in another's affirmative act, or failing to perform an act which he or she was legally required to do. *See Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citation omitted). Put differently, a Section 1983 "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (citations omitted).

"A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). To carry its burden of production, the movant "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* (citation

1    omitted). If a moving party "carries its burden of production, the nonmoving party must produce

2    evidence to support its claim or defense." *Id.* at 1103 (citing cases).

3            Here, Scott has offered no evidence that Individual Defendants Cockle, Walsh, Bain,

4    Genis, Munn, and Roberts personally participated in the alleged constitutional violations beyond

5    what she alleges in her Complaint. *See* Dkt. 31; Dkt. 1. In fact, none of these Individual

6    Defendants are even mentioned in Scott's response to Defendants' summary judgment motion.[2]

7    *See* Dkt. 31. Because Scott has not offered evidence of these Individual Defendants' involvement

8    in the alleged constitutional deprivations, the Court dismisses all federal claims against Cockle,

9    Walsh, Bain, Genis, Munn, and Roberts with prejudice. *See Hines v. Youseff*, 914 F.3d 1218,

10   1228 (9th Cir. 2019) ("[Plaintiff] must show that each defendant personally played a role in

11   violating the Constitution."); *White v. Balderama*, 321CV05095BJRJRC, 2022 WL 770297, at

12   *4 (W.D. Wash. Jan. 26, 2022*), report and recommendation adopted sub nom. White v.*

13   *Washington*, 321CV05095BJRJRC, 2022 WL 766998 (W.D. Wash. Mar. 14, 2022) (dismissing

14   individual claims of constitutional violations against employees of county agency because

15   "plaintiff has provided nothing except his conclusory allegations in his complaint to support his

16   claims, which are insufficient to survive summary judgment").

17   **B.    Scott's First Amendment retaliation claim fails as a matter of law because there was**
     **probable cause for arrest and no exception applies.**

18           Defendants argue that they are entitled to summary judgment on Scott's First

19   Amendment retaliation claim because there was probable cause for Scott's arrest and no

20

21   ─────────────────────
     [2] Holter is also never mentioned in Scott's Response. *See* Dkt. 31. But the body-worn video
22   footage submitted by Defendants shows Holter's name badge and his role in handcuffing Scott.
     Dkt. 26 at 32:36. Because the Court views all the evidence in the light most favorable to the
23   nonmoving party on summary judgment, *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir.
     2019), there is sufficient evidence in the record of Holter's personal participation in the alleged
24   constitutional violations.

recognized exception under the First Amendment applies. Dkt. 24 at 10, 13. The Court agrees.

Generally, "'the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To prevail on a First Amendment retaliation claim, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* (quoting *Hartman*, 547 U.S. at 259). The retaliatory motive "must *cause* the injury" and specifically be "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398–99 (citing *Hartman*, 547 U.S. at 259–60) (emphasis in original).

Probable cause "should generally defeat a retaliatory arrest claim[.]" *Id.* at 405; *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) ("[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim 'must plead and prove the absence of probable cause for the arrest.'") (quoting *Nieves*, 587 U.S. at 402). But "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406. Thus, the Supreme Court established that the "no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407 (citation omitted). This narrow "qualification" is commonly referred to as "the *Nieves* exception." *See Gonzalez*, 602 U.S. at 657.

       1.     *Probable cause existed for Scott's arrest.*

Smith had probable cause to arrest Scott for obstruction. There is probable cause when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being

1   arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

2       Here, Smith had a reasonable belief that Scott committed obstruction. *See* Dkt. 25 at 20;

3   RCW 9A.76.020(1). Washington's obstruction statute provides that "[a] person is guilty of

4   obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law

5   enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1).

6   Scott argues there is no probable cause because "[m]ere presence, passive noncompliance, or

7   verbal opposition does not constitute obstruction under this statute." Dkt. 31 at 18 (emphasis

8   removed) (citation omitted). But the objective evidence in the record shows that Scott was not

9   arrested until she moved past officers into the street the officers were trying to clear, while

10  physically resisting their attempts to move her out of the area. *See* Dkt. 26 at 32:09–15; *cf. State

11  v. E.J.J.*, 183 Wn.2d 497, 505, 354 P.3d 815 (2015) ("E.J.J.'s mere presence at the scene cannot

12  constitute conduct. E.J.J. had every right to stand on his own property, provided he did not

13  physically interfere with police."). And while Scott argues that officers "did not provide her a

14  meaningful opportunity to comply before rushing, pushing, and arresting her," Dkt. 31 at 9, the

15  video demonstrates that officers issued repeated verbal commands to move up the hill and

16  specific warnings to Scott that she would be arrested if she did not comply. *See, e.g.*, Dkt. 26 at

17  28:02 ("We're not saying you have to leave. We're asking you to move one block that way. You

18  will still be able to see."); *id.* at 31:55 ("You will be arrested if you do not disperse."); *id.* at

19  32:10 ("Ma'am you will be placed under arrest if you do not disperse.").

20      Scott also mischaracterizes deposition testimony to assert that Defendants lacked

21  probable cause, but this too is contradicted by the video record. Scott argues that Smith

22  "conceded in his deposition that [ ] Scott was 'barely' compliant because she had turned and

23  began to walk in the direction TPD officers were ordering observers to go in the moment before

24  she was arrested." Dkt. 31 at 3. But Smith's comment referred only to Scott's physical

compliance at a single point in time and *before* she moved back into the street towards officers on Pacific Avenue. *See* Dkt. 32 at 109 ("Would you say that . . . at 21:31:59 -- is Ms. Scott being physically compliant?  A. Barely."); *see also* Dkt. 26 at 32:09–10 (Scott stepping into Pacific Avenue and moving behind and to the right of Smith).

Finally, Scott's contention that that her arrest "lacked any legitimate basis" because prosecutors declined to bring charges against her does not preclude summary judgment. *See* Dkt. 31 at 19. The prosecutor's exercise of discretion alone, without more evidence of the reasons charges were declined, is not sufficient for a reasonable jury to find a lack of probable cause for arrest. *See De Anda v. City of Long Beach*, 7 F.3d 1418, 1422–23 (9th Cir. 1993) (probative value of dismissal of charges depends on reasons for dismissal). There is no genuine dispute of any material fact and Smith had probable cause to arrest Scott as a matter of law.

2.    *The Nieves exception does not apply.*

Nor is there any evidence from which a reasonable jury could find the *Nieves* exception satisfied. Scott contends that even if probable cause exists, she has provided "objective evidence that similarly situated individuals not engaged in protected speech were not arrested[.]" Dkt. 31 at 8 (citing *Nieves*, 587 U.S. at 407). Scott first argues that she was targeted based on her comments about "TPD's actions in the investigation into the death of Manny Ellis." Dkt. 31 at 9. But other observers who were not arrested engaged in similar speech—they just did so while following commands to move up the hill. Before Scott made her comment, another observer (the man in the orange shirt) can also be heard criticizing the alleged independence of a TPD investigation. Dkt. 26 at 27:09 ("Fuck [Mayor] Woodards, she always says that. What about those Black men that got killed. Oh, independent, my ass!"). Next, Scott asserts that unlike other observers who were not arrested, she was "filming the arrest of Russell." Dkt. 31 at 9. But the

1

2

video shows that multiple observers, including the man in orange, were also filming in a similar direction. Dkt. 26 at 32:09.

3

4

5

6

7

8

9

10

11

12

Finally, Scott compares "other observers more vocal and disruptive" that were left alone while Scott was arrested. Dkt. 31 at 9. In particular, she points to the "gentleman wearing orange and shouting at officers." *Id.* at 8–9. But this evidence only underscores why the *Nieves* exception does not apply. *Nieves* requires evidence of otherwise similarly situated individuals who were *not* engaged in protected speech and not arrested. *See Nieves*, 587 U.S. at 407. The man in orange is the opposite; he *was* engaged in similar protected speech—that was arguably more vocal and disruptive—but he was not "similarly situated" to Scott because he complied with commands to disperse. *See id.* The video shows that while he had moved out of the street towards the curb on Pacific Avenue and was standing behind officers clearing the area, Scott moved in the opposite direction towards the center of the street. *See* Dkt. 26 at 32:11.

13

14

15

16

17

18

19

20

21

22

In fact, the only other individual who had not moved from the center of Pacific Avenue after police gave their final warning was also arrested. *See id.* at 32:14; Dkt. 25 at 10 (Arrest Report for Russell); *cf. Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022) (finding that plaintiffs showed objective evidence of similarly situated individuals not being arrested for sidewalk chalking when (1) plaintiffs were arrested "while others who chalked and did not engage in anti-police speech were not arrested"; (2) there were only two other "instances in which chalkers were suspected of or charged with violating" the law; and (3) there was "no evidence that anyone besides the [p]laintiffs has been arrested for chalking on the sidewalk."). Because probable cause existed for Scott's arrest and the *Nieves* exception does not apply, Scott's First Amendment claim fails as a matter of law.

23

24

3.    *The Individual Defendants are also entitled to qualified immunity.*

Although the Court has found no underlying constitutional violation, Scott's claim would also fail because she has not shown that the law was clearly established that Individual Defendants lacked probable cause under the circumstances here. The defense of qualified immunity protects "police officers from [Section] 1983 liability unless (1) the officers 'violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time' of the violation." *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). Courts may address either prong first, *see Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009), and "may exercise [their] discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021) (citations omitted). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Perez*, 98 F.4th at 924 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

Scott has not identified any cases that would make it clear to every reasonable official that an arrest for obstruction under similar circumstances violates the First Amendment. She cites only two cases that reflect generalized First Amendment protections for filming public officials. Dkt. 31 at 8 (first citing *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); then citing *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018)). Neither case establishes that Individual Defendants' actions to arrest Scott once she physically interfered with the police perimeter was "clearly" unconstitutional under the law. *See Perez*, 98 F.4th at 924. Accordingly, the remaining Individual Defendants are entitled to summary judgment on Scott's First Amendment claim.

1

2

**C.     Scott's unlawful arrest claim also fails because there was probable cause for arrest.**

3          For the same reasons, Scott's Fourth Amendment unlawful arrest claim against Individual

4   Defendants fails. "A claim for unlawful arrest is cognizable under [Section] 1983 as a violation

5   of the Fourth Amendment, provided the arrest was without probable cause or other justification."

6   *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (quoting *Lacey v.*

7   *Maricopa Cnty.,* 693 F.3d 896, 918 (9th Cir. 2012)). Because the Court has found probable cause

8   for Scott's arrest, *see supra* Sec. IV.B.1, her unlawful arrest claim fails as a matter of law. *See*

    *Velazquez*, 793 F.3d at 1018.

9          Like her First Amendment claim, Scott has also offered no persuasive authority that

10  Individual Defendants would not be entitled to qualified immunity. Scott cites two cases that

11  merely reflect general Fourth Amendment protection against unlawful arrest. Dkt. 31 at 9–10

12  (first citing *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004); then citing *Beck v.*

13  *Ohio*, 379 U.S. 89, 91 (1964)); *id.* at 9 ("It is also clearly established that an arrest made without

14  probable cause violates the Fourth Amendment."). Thus, the remaining Individual Defendants

15  are entitled to summary judgment on Scott's Fourth Amendment unlawful arrest claim.

16  **D.     Scott has not shown sufficient evidence to raise a question of material fact on her
           Fourth Amendment excessive force claim.**

17

18         Scott advances a Fourth Amendment excessive force claim against four of the Individual

19  Defendants: Cockle, Genis, Holter, and Smith. Dkt. 1 ¶¶ 71–83. Defendants Cockle and Genis

20  have already been dismissed because Scott did not present evidence of their personal

21  participation. *See supra* Sec. IV.B.1. Thus, the Court only considers Scott's excessive force

22  claim against Defendants Holter and Smith. *See* Dkt. 1 ¶¶ 71–83.

23         Defendants argue that Smith's body-worn video shows that "[m]inimal force was used

24  and the force that was used was only necessary because [Scott] physically attempted to avoid

being arrested." Dkt. 24 at 18. Scott argues that at minimum, material disputes of fact preclude summary judgment. Dkt. 31 at 22. Scott "posed no threat, made no physical resistance, and was forcibly taken to the ground and handcuffed without need or warning[,]" especially given that the "severity of the offense was minimal[.]" *Id.* She concludes that under the controlling test for reasonableness in *Graham v. Connor*, 490 U.S. 386 (1989), "none of the *Graham* factors justified the level of force applied." *Id.* (citation modified).

Courts analyze Fourth Amendment excessive force claims under the "objective reasonableness" standard. *Graham*, 490 U.S. at 388. Courts assess the "objective reasonableness of a particular use of force . . . [by] (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion.'" *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (citation modified).

    1.    *Type and amount of force*

Courts classify the force used by considering the "nature and degree of physical contact" and "the risk of harm and the actual harm experienced." *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022) (quoting *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1152 (9th Cir. 2022)). Also relevant is the "presence of non-minor physical injuries[.]" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824–25 (9th Cir. 2010)) (internal quotation marks omitted).

The Ninth Circuit has recognized that a "physical tackle that results in severe injury may constitute a significant use of force." *Andrews*, 35 F.4th at 716 (citing cases). In *Andrews*, "the detectives forcibly tackled [the plaintiff] to the ground with enough force to fracture his hip." *Id.* "The injury resulted in 'excruciating pain' and required two surgeries." *Id.* The court found the use of force "substantial." *Id.*; *see also Rice*, 989 F.3d at 1121 (finding use of force substantial

where officers' takedown maneuver tripped plaintiff "so that he would fall to the ground as they held his arms behind his back . . . face-first onto the pavement," resulting in "extreme pain immediately following his arrest and long-term physical pain for which he received medical treatment").

But the Ninth Circuit has also instructed that brief takedowns are not considered "substantial" uses of force when no severe injuries result from the actions or the risk of harm was low. *See, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 650–652 (9th Cir. 2001) (finding a "minimal" intrusion when court accepted as true that plaintiff fractured her finger when three officers pushed her to the ground to handcuff her); *Williamson*, 23 F.4th at 1152 (9th Cir. 2022) (finding a "minimal" intrusion after officers dragged a handcuffed protestor from a city hall meeting for approximately 12 seconds who "refused to leave on her own or cooperate in being removed," and who sought immediate medical treatment resulting in a "sprained wrist, mild swelling, and a torn rotator cuff").

Here, the undisputed evidence in the record shows that "the nature and degree of physical contact" made by officers was minimal. *See Andrews*, 35 F.4th at 716. The primary dispute of fact is whether officers intended to take Scott to the ground to handcuff her or whether she fell while trying to pull away from the officers. *See* Dkt. 1 ¶ 20 ("Ms. Scott stumbled to the ground on Pacific at an accelerated rate due to the shoves of Smith, Holter, Cockle and Genis."); Dkt. 31 at 4 ("[Smith] was pushed to the ground[.]"); Dkt. 35 at 9 ("[H]er actions of moving away from officers caused her fall to the ground."); Dkt. 25 at 22 (Smith stating in his Supplemental Report that he "was able to grab her right arm and pull her down to the ground."). But even viewing the facts in her favor—and accepting that officers intentionally took Scott down—no reasonable jury could find that the "degree of physical contact" made by officers or the "risk of harm and the actual harm experienced" by Scott is "substantial" under the law. *See Andrews*, 35 F.4th at 716.

Officers used minimal force to counter her resistance and place handcuffs on her while she was on the ground. *See* Dkt. 26 at 32:31–50. Scott was on the ground for less than a minute and officers moved her back to her feet as soon as she was handcuffed. *See id.* at 33:00–04. And while she does recount physical pain resulting from the officers' actions, *see* Dkt. 25 at 32, Scott does not describe any of her injuries as severe and did not seek medical attention. *Id.* at 36–37.

Thus, the Court finds that, under the "totality of circumstances" in this case, the type and amount of force that the officers used was minimal. *See Williamson*, 23 F.4th at 1152.

    2.    *Governmental interest*

Under *Graham*, courts "evaluate the state's interests at stake by considering '(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Rice*, 989 F.3d at 1121 (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). "[T]he 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Id.* (quoting *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017)). But these factors are not exclusive and "must be considered under the totality of the circumstances, including whether 'less intrusive alternatives' were available to the officers and whether the officers gave 'proper warnings' before using force." *Andrews*, 35 F.4th at 716 (quoting *Rice*, 989 F.3d at 1122); *see also Bryan*, 630 F.3d at 831 ("[W]hile by no means dispositive, that [the officer] did not provide a warning before deploying the [taser] and apparently did not consider less intrusive means of effecting [plaintiff's] arrest factor significantly into our *Graham* analysis.").

Scott argues that the "severity of the offense was minimal" and that she "posed no threat, made no physical resistance, and was forcibly taken to the ground and handcuffed without need

or warning[.]" Dkt. 31 at 22. The Court partially agrees with Scott's analysis but finds other assertions plainly contradicted by the record.

Scott is correct that the severity of the crime—misdemeanor obstruction—is a minimal, nonviolent offense. *See* Dkt. 25 at 20; *Rice*, 989 F.3d at 1121. On the second *Graham* factor, Defendants contend that because Scott "moved behind officers after being order[ed] to move out of the street[,]" she posed "a threat to officer safety." *See* Dkt. 24 at 19. But Defendants provide no evidence or authority that Scott's movement, though noncompliant, equated to "an immediate threat to the safety of the officers or others." *See Rice*, 989 F.3d at 1121; Dkt. 24 at 19. Instead, the record indicates that Scott moved into the street to film Russell's arrest. *See* Dkt. 26 at 32:13; Dkt. 25 at 10 ("I then observed [Scott] standing to the left of [Russell] videotaping [ ] Smith and me.").

Still, there was some state interest in using a low level of force. The video presents undisputed evidence that Scott resisted "less intrusive alternatives" attempted by Smith to move her out of the street once she started walking east into Pacific Avenue. Dkt. 26 at 32:10–11 (video showing that as Smith turned to see Scott on his right, he moved his arm towards her, which Scott brushed off). She continued to pull away from Smith's attempt to grab her by the wrist immediately before and after Smith stated she was under arrest. *Id.* at 32:14–16. And Scott continued to resist the effort to handcuff her when she was on the ground. *Id.* at 32:32–36.

Smith and other officers also issued multiple verbal commands to move up the hill and gave Scott two specific warnings before she was arrested, and any force was used. *See* Dkt. 26 at 31:55 ("You will be arrested if you do not disperse."); *id.* at 32:10 ("Ma'am you will be placed under arrest if you do not disperse."); *see also Williamson*, 23 F.4th at 1153–54 (finding that, despite plaintiff's minor offense of disrupting a city council meeting and not posing a physical threat, the fact that "[o]fficers repeatedly warned the protesters that they had to leave . . . or they

would be arrested, and they refused to comply" meant there was at least some governmental interest in use of force); *cf Andrews*, 35 F.4th at 716 (concluding that officers did not establish a strong governmental interest in takedown of plaintiff based in part on not presenting any evidence that "tackling . . . was the only option available to them" and not disputing that they gave "no warning before they tackled [plaintiff]"). Because there is undisputed video evidence that Scott actively resisted arrest, that Smith attempted less intrusive means of moving her before the arrest and subsequent takedown, and that there were repeated general and specific warnings given to Scott that she had to move out of the street or would be arrested, officers had some interest in using force.

### 3.    *Balance of interests*

Finally, the Court weighs whether the officers' "degree of force used was warranted by the governmental interests at stake." *Andrews*, 35 F.4th at 716 (citation modified). Viewing the evidence in the light most favorable to Scott, the officers' use of force was minimal. Even accepting that officers intentionally took Scott down, the "undisputed evidence shows that the officers used only the force reasonably necessary" to control her body until she could be placed in handcuffs. *See Williamson*, 23 F.4th at 1154 (citation omitted); Dkt. 26 at 32:31–50. This lasted less than a minute and caused no serious injury. Dkt. 26 at 32:18–33:09; Dkt. 25 at 36–37. And officers' minimal use of force occurred only after some physical resistance from Scott to being arrested and handcuffed, *see id.* at 32:10–11; 32:32–36, as well as officers' prior attempts to warn and use less intrusive means to prevent her from moving into the street that they were clearing, *see id.* at 31:55, 32:14–16, 32:10. Applying the *Graham* factors and guided by Ninth Circuit precedent, no reasonable jury could find that the force used was excessive.

4.     *Qualified immunity*

Even if a reasonable jury could find that the force was excessive, the officers would still be entitled to qualified immunity "unless the violated right was clearly established at the time of the incident." *Andrews*, 35 F.4th at 718 (citation omitted). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 3 (2021) (per curiam)).

"The Supreme Court has increasingly reiterated that to meet this standard a right 'must be defined with specificity' rather than 'at a high level of generality.'" *Id.* (quoting *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019)). Such "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix,* 577 U.S. at 12). Put differently, the purpose of the qualified immunity doctrine in the Fourth Amendment context is to recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Andrews*, 35 F.4th at 715 (quoting *Graham*, 490 U.S. at 396–97). Thus, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 718 (quoting *Rivas-Villegas*, 595 U.S. at 3).

All of the cases cited by Scott in which the Ninth Circuit denied officers qualified immunity involve more serious uses of force against more compliant individuals. *See* Dkt. 31 at 20–22. In *Blankenhorn*, after the plaintiff refused an officer's order to kneel and be handcuffed, three officers "[a]lmost immediately . . . gang-tackled him." 485 F.3d at 478. Although the plaintiff "did not attempt to prevent the officers from handcuffing him" on the ground, officers

nevertheless punched him several times in the face and body, "pushed his face into the pavement by shoving a knee into the back of his neck," and "placed hobble restraints on his ankles, which made it difficult for [the plaintiff] to move and breathe." *Id.*

Similarly, in *Young v. County of Los Angeles*, an individual at a traffic stop refused to return to his car after handing the officer his registration, instead sitting on the curb nearby eating vegetables. 655 F.3d 1156, 1159 (9th Cir. 2011). The court found the officer was not entitled to qualified immunity when the officer pepper sprayed the individual from behind without warning and then struck him multiple times with a baton. *Id.* at 1159–60, 1168; *see also Smith v. City of Hemet*, 394 F.3d 689, 703–04 (9th Cir. 2005) (denying qualified immunity to officers where totality of force included "four blasts of pepper spray, slamming [plaintiff] down onto the porch, dragging him off the porch face down, ordering the canine to attack him three times, and the resultant dog bites and physical assaults on his body" where plaintiff also produced evidence that lesser means to complete the arrest were available).

Finally, Scott cites *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002). *See* Dkt. 31 at 20. There, two officers encountered a man, previously diagnosed with paranoid schizophrenia, who was observed "walking erratically" and "screaming periodically," but "at most . . . appeared guilty of public intoxication." *Santos*, 287 F.3d at 849, 854. Despite describing the plaintiff as "passive" and there being "no evidence that [he] actively resisted arrest[,]" officers took him down to the ground with such force that he "suffered a broken vertebra which caused him both pain and immobility." *Id.* at 854–55.

In sum, no case cited would have put a reasonable officer on notice that it would violate the Fourth Amendment to take Scott to the ground and use the officers' weight to counter at least some physical resistance until she could be handcuffed, for less than a minute, resulting in no serious injury. *See Andrews*, 35 F.4th at 718. If anything, existing Ninth Circuit law would have

made clear that the officers' actions were within the bounds of acceptable force under the circumstances. *See e.g.*, *Jackson*, 268 F.3d at 650–652 (holding that there was no excessive force when a plaintiff, part of a large group of citizens refusing to disperse, attempted to interfere with an arrest and was pushed to the ground, handcuffed, and "roughly" pulled to her feet, suffering a fractured finger).

Thus, even if a reasonable jury could find that there was a question of fact on Scott's excessive force claim, the Individual Defendants would still be entitled to qualified immunity. *See Andrews*, 35 F.4th at 718. The Court therefore dismisses the Fourth Amendment excessive force claim against the Individual Defendants.

**E.    The City is not liable under *Monell* because there is no underlying constitutional violation.**

The Court also dismisses Scott's claims against the City for violation of her First and Fourth Amendment rights. *See* Dkt. 1 ¶¶ 8, 45–97; Dkt. 31 at 10–14. To state a Section 1983 claim against a municipality, a plaintiff must allege facts that, if proven, would establish that a constitutional right was violated pursuant to a municipal policy, practice, or custom. *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). Because there is not sufficient evidence from which a jury could find an underlying constitutional violation, there can be no *Monell* claim against the City. *See Baker v. Clearwater County*, No. 22-35011, 2023 WL 3862511, at *3 (9th Cir. June 7, 2023) ("A *Monell* claim cannot survive without an underlying constitutional violation.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)).

The Court thus dismisses all federal claims against the City of Tacoma.

**F.    Scott's conspiracy claim also fails because there is no underlying constitutional violation.**

Scott cannot sustain a claim that Defendants conspired to deprive her of her First and Fourth Amendment rights because the Court has dismissed all of Scott's underlying constitutional claims. "To establish liability for a conspiracy in a [Section] 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999)). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* (quoting *Mendocino Envtl. Ctr.*, 192 F.3d at 1301). "[E]ach participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc) (citation omitted).

But "[c]onspiracy is not itself a constitutional tort under [Section] 1983." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). "It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation." *Id.*; *see also Neal v. City of Bainbridge Island*, 3:20-CV-06025-DGE, 2024 WL 1717030, at *8 (W.D. Wash. Apr. 22, 2024), *aff'd*, 24-3299, 2025 WL 1937l300 (9th Cir. July 15, 2025) ("Because Plaintiff cannot, as a matter of law, establish an underlying First Amendment . . . violation, Plaintiff cannot prevail on her conspiracy claim.") (citation omitted).

Because there is not sufficient evidence from which a jury could find an underlying violation of constitutional rights, Scott cannot establish a claim for conspiracy to deprive her of such rights. *See Lacey*, 693 F.3d at 935. Therefore, the Court grants summary judgment and dismisses the claim.

1

2

**G.     Scott's negligence claim fails because she has not shown that Defendants owed her a specific duty.**

Defendants move for summary judgment on Scott's state law negligence claim, arguing that she "fails to establish the nature and scope of the duty that was owed, how it was allegedly breached, and to cite to evidence in support [of] both these elements," a necessary predicate for any negligence action. Dkt. 24 at 25. Defendants contend that this showing is especially relevant in negligence actions against police officers because "[l]aw enforcement does not owe a duty to exercise reasonable care to every individual they encounter during an incident untethered from any recognized exception to the public duty doctrine[.]" *Id.* at 26. The Court agrees.

"The public duty doctrine recognizes that governments, unlike private persons, are tasked with duties that are not actionable duties within the meaning of tort law." *Beltran-Serrano v. Tacoma*, 193 Wn.2d 537, 549, 442 P.3d 608 (2019) (citation omitted). "[A] city's statutorily imposed obligation to provide police services, enforce the law, and keep the peace" are "statutory duties [that] have always been, and will continue to be, nonactionable duties owed to the public at large." *Id.* at 552.

Still, the common law duty of reasonable care to "refrain from causing foreseeable harm in interactions with others . . . applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance." *Id.* at 550 (citations omitted). Under Washington law, "governmental entities 'shall be liable for damages arising out of their tortious conduct . . . to the same extent as if they were a private person or corporation.'" *Norg v. City of Seattle*, 200 Wn.2d 749, 756, 522 P.3d 580 (Wash. 2023) (quoting RCW 4.96.010(1)). Thus, Scott may bring negligence claims against police officers that "arise out of [an officer's] direct interaction with [the plaintiff], not the breach of a generalized public duty." *See Beltran-Serrano*, 193 Wn.2d at 551. On the other hand, "[i]f the duty that the

government allegedly breached was owed to the public at large, then the public duty doctrine

applies," in which case "the negligence claim must be dismissed for lack of an actionable duty

unless there is an applicable exception." *Norg*, 200 Wn.2d at 758. "Thus, to determine whether

the public duty doctrine bars the [plaintiff's] claim, . . . [the Court] must identify the duty that the

[defendants] allegedly breached and determine whether that duty is based on a generally

applicable statute or an individually applicable common law duty." *Id.* at 759. This is a question

of law for which the plaintiff bringing the negligence claim bears the burden. *See id.*; *Beltran-*

*Serrano*, 193 Wn.2d at 549 ("To establish a duty in tort against a governmental entity, a plaintiff

must show that the duty breached was owed to an individual and was not merely a general

obligation owed to the public.").

      For instance, in *Beltran-Serrano*, the Washington Supreme Court found that a negligence

claim arising from a police shooting of an individual was viable, and not barred as a public duty

claim, in part because it was based on the officer's decision to prevent the plaintiff from

"walking away" and the officer's "lack of adequate training." *See Beltran-Serrano*, 193 Wn.2d at

544; *see also id.* ("The core of his negligence claim is that Officer Volk unreasonably failed to

follow police practices calculated to avoid the use of deadly force.").

      Although Scott asserts in the Complaint that Defendants "breach[ed] the *Beltran-Serrano*

standard of care," Dkt. 1 ¶¶ 98–102, her Response fails to show evidence (or even allege) that

Defendants would be liable for anything beyond a "breach of a generalized public duty." *See*

*Beltran-Serrano*, 193 Wn.2d at 551; Dkt. 31 at 25–26 ("Tacoma Police owed Plaintiff a duty to

conduct themselves in accordance with constitutional and statutory obligations, including

providing adequate dispersal warnings, using only reasonable force, and refraining from

retaliatory conduct."). Thus, Scott has not articulated the non-public duty owed to her that would

support a negligence cause of action against the individual officers. *See Norg*, 200 Wn.2d at 758.

1

2

3

Because Scott cannot sustain a negligence claim against the Individual Defendants, Scott's vicarious liability claim against the City also fails. *See* Dkt. 1 ¶ 102. Accordingly, the Court grants Defendants summary judgment on Scott's negligence claim.

4

5

**H.    Scott's defamation claim is barred by the statute of limitations and pre-suit notice requirement.**

6

7

8

9

Finally, Defendants move for summary judgment on Scott's defamation claim against Defendants Holter, Roberts, Smith and the City for allegedly writing false statements of fact in their reports concerning Scott. Dkt. 24 at 26; Dkt. 1 ¶ 103. Defendants argue that Scott's defamation claim must be dismissed because Scott "failed to submit a Tort Claim or commence this lawsuit within the applicable Statute of Limitations." *See* Dkt. 24 at 26.

10

11

12

13

14

15

16

17

18

19

20

21

Under Washington law, defamation actions must be commenced within two years of when the alleged tort occurred. RCW 4.16.100(1) ("Actions limited to two years . . . (1) An action for libel, slander, assault, assault and battery, or false imprisonment."); *Milligan v. Thompson,* 90 Wn. App. 586, 592, 953 P.2d 112 (1998) ("Milligan's defamation cause of action has a two-year limitation period . . . . Generally, a tort or personal injury action accrues at the time the tortious act or omission occurs.") (first citing RCW 4.16.100(1); then citing *White v. Johns–Manville Corp.,* 103 Wn.2d 344, 348, 693 P.2d 687 (1985)). Additionally, claims against local governments or their employees—such as Scott's defamation claim—"shall be presented to the agent within the applicable period of limitations within which an action must be commenced." RCW 4.96.020(2); *see also Hanson v. Carmona*, 1 Wn.3d 362, 372–73, 525 P.3d 940 (2023) ("[T]he pre[-]suit notice requirement applies to employees acting within the scope of employment, even when sued individually.") (citation omitted).

22

23

24

The Court agrees with Defendants that Scott's defamation claim is barred by both RCW 4.16.100(1) and RCW 4.96.020(2). *See* Dkt. 24 at 26. Scott filed her lawsuit on January 22,

2024, Dkt. 1, nearly three years after the alleged tort took place, *see, e.g.*, Dkt. 25 at 18–22 (Scott's Supplemental Report); Dkt. 1 ¶ 110 ("Defendant Smith falsely wrote that Ms. Scott 'moved east, into my line of officers[.]'"). Additionally, Scott's Tort Claim Damages form was received on July 25, 2023. Dkt. 25 at 26. The incident date listed on the form is January 23, 2021, more than two years before the City received notice of the tort claim. *See id.* at 27.

Although Scott states that she "submitted [a] timely tort claim notice under RCW 4.96.020," she fails to rebut the evidence in the record. *See* Dkt. 31 at 28. At oral argument, Scott's counsel also asserted that her defamation claim was not barred because "the ongoing harm wasn't discovered until the Complaint was being prepared." But counsel similarly offered no evidence or authority to support the theory that this altered when the defamation cause of action accrued or tolled the statute of limitations. *See Milligan*, 90 Wn. App. at 592 ("Generally, a tort or personal injury action accrues at the time the tortious act or omission occurs."). Scott's defamation claim must therefore also be dismissed.

## V.    CONCLUSION

For the reasons explained above, the Court GRANTS Defendants' motion for summary judgment, Dkt. 24, and all claims are DISMISSED WITH PREJUDICE.

Dated this 5th day of September, 2025.

Tiffany M. Cartwright
United States District Judge